LORAINE DEVELOPMENT CO. v. GENERAL ELECTRIC CO.

(District Court, N. D. New York. July 22, 1912.)

**1. PATENTS (§ 165*)—CONSTRUCTION AND VALIDITY—SUFFICIENCY OF CLAIMS.**
However valuable, new, and novel the actual discovery and invention of a patentee, and however accurate the disclosure and description thereof in the specification of his patent, he must claim it, or it is deemed abandoned to the public. While that construction should be given to a claim which will uphold it, if it can be done without doing violence to the language used, it is not sufficient to uphold a claim that the court can see that the patentee intended to cover his real invention by the language used, when in fact he did not.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. § 165.*]

**2. PATENTS (§ 246*)—INFRINGEMENT—COMBINATIONS.**
If a patentee introduces an unnecessary element into his claim for his invention, another, who discovers that such element is unnecessary or superfluous, and therefore does not use it, is not an infringer, although he makes a structure otherwise identical with that of the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 387; Dec. Dig. § 246.*]

**3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ARC LAMP.**
The Carbone patent, No. 975,935, for an arc-lamp globe, specially adapted to the use of impregnated carbons, claims 1 and 3, which cover a globe "divided into a plurality of superposed chambers by suitable configuration of the walls," the middle or lighting chamber having a transparent wall, which surrounds the arc closely, so that the heat will prevent the condensation of the gases therein and their deposit on the globe to obscure the light, an upper or condensation chamber for such gases, and a lower or settling chamber, contemplates a physical separation of the chambers by the configuration or contraction of the globe, and, while not anticipated and valid, such claims are not infringed by a globe of conical shape with straight walls, without contractions or other configuration to divide it into chambers.

In Equity. Suit by the Loraine Development Company against the General Electric Company. On final hearing. Decree for defendant.

C. P. Goepel, of New York City, Wm. G. Van Loon, of Albany, N. Y., and Theodore Swift, of Albany, N. Y., for complainant.

Albert G. Davis, of Schenectady, N. Y., and A. D. Salinger, of Boston, Mass., for defendant.

RAY, District Judge. This is a patent for new and useful improvements in arc-lamps and was granted November 15, 1910, to Tito Levio Carbone. The patent says that:

"The present invention relates to arc-lamps for long lighting hours, and has the object of keeping clean the part of the globe from which the light mainly issues, especially in case of the employment of impregnated carbons."

The patent then asserts:

"The use of the flaming arc is connected with the disadvantage of requiring a globe or inclosure for the arc, and the vapors invariably given off by the flaming arc of impregnated or other carbons yield deposits which cloud the transparent walls and tend to obscure the arc. Attempts have been made to overcome this difficulty by utilizing the heat of the arc to set up

a vigorous circulation of the gases at the interior of the globe by providing a more or less highly organized exterior circulatory system for the purpose of returning the gases which have been forced out at the top to the bottom of the globe. These gases carry the vapors away from the arc and deposit the condensation products in the cooler parts of the circulatory system arranged to receive them outside of the arc-inclosing globe itself. In such attempts as have been made to carry out this arrangement, a number of difficulties have been encountered. For instance, some definite construction must be employed for the purpose of returning the gases downwardly from the arc to the lower end of the globe. These channels necessarily obstruct the arc more or less and prevent it from delivering its full illuminating effect, cutting down its efficiency and in some instances casting large shadows. These difficulties are independent of the complexity and elaborate structures that become necessary. The object of the present invention is to eliminate these difficulties and attain the desired result in a more direct manner and by simpler and less expensive means."

The patent then declares that, as a result of much testing, means were devised whereby the desired result could be accomplished, and the circulatory system much simplified at the same time; that—

"the necessity of any outside duct or ducts for the return of the gases to the lower portion of the arc-space is dispensed with and the whole structure simplified by reducing the same to a single globe or inclosure which is provided with a plurality of chambers suitably connected."

It then states that one embodiment of the invention, which has given excellent results, has three such chambers arranged one above the other, the middle chamber being transparent and containing the arc, which chamber, for the best light-emitting and distributing qualities, may be conical in shape with the walls brought preferably into more or less proximity to the arc, so as to better subserve the efforts of maintaining its surface free from deposits; also, that it is thought the gases arisng around the upper electrode are cooled in the upper chamber and fumes deposited therein, and that the cooled gases flow along the outer part of the globe adjacent to the wall of the globe; also, that the heat adjacent the arc would be sufficient to prevent the deposit of the fumes, at that part of the globe, meaning, but around the lower electrode the flow of gas would be slow enough to permit suspended particles to fall in the lower chamber. The patent also states that excellent results have been obtained when a space has been provided both above and below the arc, and that when either space was omitted the deposit would encroach on and partially obscure the light-emitting wall of the globe surrounding the arc. The patent then states that as a means of securing a clear line of demarcation of the deposits and preventing their encroachment upon the transparent wall immediately surrounding the arc *a change of angle or inclination* of the wall of the globe with respect to the arc or general alignment of electrodes is found effective and *an inner* ridge or contraction will accomplish this result. This, of course, means a break or change in the general line of the wall of the globe at the point or points where it is supposed the deposit will end. I doubt not that an actual contraction of the glass forming the wall of the globe was contemplated. The patent says, however, that—

"a clear line of demarcation is not in all cases necessary, and *any means of confining to a greater or less extent the deposits will fulfil the conditions*;

the necessary feature being an organization whereby the phenomenon of diffusion operates to carry the vapors produced at the arc away from the light-emitting wall before they are condensed and the oxides or other solids deposited."

The patent then explicitly states:

"The present invention consists in providing a *separate* chamber for the arc by forming *a series of circular contractions in the globe,* so that it is divided into several superposed chambers."

The office and function of this is thus described:

"By this device the heat of the arc is concentrated in the middle member, but at the same time the walls of the middle chambers are protected by their conical shape against decomposition, and can therefore be arranged closer to the arc than was possible hitherto. The advantage of this arrangement is that no gases are condensed on the walls of the middle chamber inclosing the arc."

The patentee shows several forms of globes according to his invention, but says:

"It will be understood that the globe may take a great many different forms without departing from the spirit of the invention."

The claims in issue read as follows:

"1. An arc-lamp globe specially adapted to the use of impregnated carbons, and divided into a plurality of superposed chambers by suitable configuration of the walls, the middle chamber having a transparent wall surrounding the arc closely for preventing the gases produced by the arc from condensing on said walls. * * *

"3. An arc-lamp globe specially adapted to the use of impregnated carbons, and divided into a plurality of superposed chambers by suitable configuration of the walls, the walls of the middle chamber surrounding the arc as closely as possible, the said walls consisting partly of glass and partly of metal."

It is evident that claim 1 calls for (1) an arc-lamp globe, which (2) is divided into a plurality of superposed chambers by suitable configuration (shaping) of the walls; the *middle* chamber having a transparent wall which surrounds the arc *closely.* The function of this particular chamber is not only to allow the light to shine through, but to prevent the gases produced by the arc from condensing on the walls of such chamber. We understand from the specifications that the walls of this middle chamber surround the arc *closely,* so that such walls may be heated and thereby prevent the condensation of the gases in that chamber. We also understand from the specifications that the globe is divided into so-called chambers by a suitable configuration of the walls thereof, to the end that there may be a clear line of demarcation between the lighting chamber and the one above and the one below, which we may properly name condensing and settling chambers. By this construction or shaping of the globe and this location of the walls of the middle chamber the object of the invention is accomplished, viz., "keeping clean the part of the globe from which the light mainly issues."

First, the wall of this lighting chamber from which the light mainly issues closely surrounds the arc and is kept heated, so there is no condensation and settling of gases therein; and, second, by the "suitable

configuration of the walls of such globe" we have the clear line of demarcation of the deposits, and the encroachment of such deposits upon the transparent wall immediately surrounding the arc is prevented. By this configuration of the walls of this chamber we have "a change of angle or inclination of the wall with respect to the arc or general alignment of electrodes," and such a configuration is all that the first claim of the patent demands. It is not at all necessary that the configuration correspond to any one of the figures of the drawings of the patent as those are illustrative only. While claim 1 describes the wall of the middle chamber, and locates it, and states the purpose of such location, claim 2 locates the wall of the midde chamber, and then describes the walls of the globe (all three chambers), and says they are partly of glass and partly of metal, meaning, not a mixture of glass and metal, but that the walls of the upper chamber and probably of the lower chamber may be of metal.

The complainant insists that the words "providing a separate chamber for the arc by forming a series of circular contractions in the globe, so that it is divided into several superposed chambers," provide or describe a structure which is conical in shape, and that this is done by building an infinitesimal number of circular contractions upon each other, each succeeding contraction of glass being slightly smaller than the one above, and that in this way the conical shape of the wall of the middle chamber is produced. The complainant insists that this is the structure referred to in the claim, viz., "a plurality of superposed chambers by suitable configuration of the walls," and that no reference is had to the circular contractions in the globe plainly shown in the drawings of the patent, and which divide Figs. 1, 2, and 4 into four chambers and Fig. 3 into three chambers.

### Defendant's Structure.

The defendant uses a globe quite similar and for all practical purposes the same as complainant's (that of the Carbone patent), except in one particular. By looking at complainant's globe, Fig. 3, and leaving off the upper chamber, which we have referred to as the condensing chamber, it is noted that the remaining part is shaped like a somewhat flaring mouthed beer glass, with a contraction about halfway down, which divides it into two parts. The upper part of this surrounds the arc, and when united to the upper part or condensing chamber we have the condensing chamber at the top, then the lighting chamber in the middle, and at the bottom the settling chamber. The complainant's expert speaks of these as zones—the condensing zone, the lighting zone, and the settling zone, containing the refuse powder not retained in the upper or condensing chamber. The defendant dispenses with the contraction in the globe walls, followed by an expansion thereof, and has a structure or globe (leaving off the condensing chamber or apartment) shaped like a beer glass with a wide or flaring mouth. The walls of this globe, or this part of the globe which includes the part devoted to lighting and the part devoted to the settling particles, have such shaping or configuration with respect to the arc or general alignment of the electrodes, the alignment of the electrodes

being perpendicular, and the arc, of course, between them, that they slope away from the electrodes as we go towards the condensing or upper chamber and towards the prolonged line of the electrodes as we go downward. In short, the two chambers (if there are two within the meaning of the patent) are cone-shaped, and the axis of such cone is the line of the electrodes. But there is no change of angle or inclination of the walls of these two chambers with respect to the arc or general alignment of electrodes from base to top, as such walls rise in a straight, but not perpendicular, line; but the distance of such walls from the axis of the cone or center line of the chambers gradually increases. It follows that as the lighting chamber widens at all points, is funnel-shaped, above the arc there is no obstruction to the process or "phenomenon" of diffusion of the gases, or vapors, generated at the arc, and as diffusion proceeds, and as the heat at the zone of the arc (lighting chamber) prevents condensation or deposit of soot or smoke or gaseous products on the walls there, they gradually rise or are diffused into the upper space or condensing chamber, if lighter than the heated zone, or fall, if heavier. The heavier oxides or solids, if not carried to the condensing chamber, can fall a certain distance before coming in contact with the walls of the globe; but those carried or moving upward meet no obstruction whatever until they reach the condensing chamber and come in contact with its walls.

### Theory of Carbone.

It is plain, although not explained at length, that Carbone's idea was that the gases, vapors, etc., generated or produced at the arc, and the solids contained therein, are dissipated in the spaces above and below the arc, and on each side thereof, for that matter. by the "phenomenon" of diffusion, and that heat prevents their condensation and deposit, while cold hastens and produces such condensation and a settling thereof. His idea seems to be that by keeping the wall of the lighting chamber heated, on account of its proximity to the arc itself, there would be no condensation in or settling on the walls of such chamber, and that diffusion would take such gases, etc., away to the cooler zones or chambers, where they would be condensed and deposited, except as to the heavier products, which would descend to the lowest chamber. To repeat, Carbone says:

"Of course, a clear line of demarcation is not in all cases necessary, and any *means* of confining to a greater or less extent the deposits will fulfill the conditions; *the necessary feature being* an organization whereby the phenomenon of diffusion operates to carry the vapors produced at the arc away from the light-emitting wall before they are condensed and the oxides or other solids deposited."

Figs. 1 and 2 of his drawings show a constriction of the wall of the lighting chamber where it joins the condensing chamber, while Figs. 3 and 4 show none, but an enlargement or expansion into the enlarged condensing chamber. Carbone, after making the above statement, proceeds to say:

"The present invention consists in providing a separate chamber for the arc by forming a *series of circular contractions* in the globe"

—not lighting chamber, so that it (the globe) is divided into several superposed chambers. By *this* device the heat of the arc is concentrated in the middle member (meaning chamber), and the concentration is effected by the "circular contractions" shown and described.

While Carbone describes his present invention by the use of the words "a series of circular contractions in the globe, so that it is divided into several superposed chambers," when we come to the several claims of the patent we find a change of language in some of them. While claims 1 and 3 (in suit and alleged to be infringed) say "divided into a plurality of superposed chambers by suitable *configuration* of the walls," and speak of the "middle chamber," that is, the heating chamber, the other claims of the patent use the words "divided into three superposed chambers by suitable *contractions* in the wall." Hence it is argued with force that there is an essential difference between claims 1 and 3 and the remaining claims, and that, while claims 2, 4, 5, and 6 call for the contractions in the walls, the claims in suit, 1 and 3, do not, and include and cover any structure having such a configuration of the walls of the globe that there is in fact a heated chamber or zone, a condensing chamber or zone, and a deposit chamber or zone, although there is nothing to indicate, prior to actual use, where the one chamber or zone begins or the other ends. The contention is that a globe so shaped, even if nothing more than a cone (inverted), that when the arc-lamp is in operation there is a space so near the arc that the gases and vapors will not condense there, leaving a lighting space, zone, or chamber, and another space above where, on account of the cold, the gases and vapors are condensed, thus forming a condensing space, zone, or chamber, and another space below the heated space where the heavy residuum may fall and remain in its condensed form, even though there is nothing to indicate, prior to use, where the one space or chamber begins and the other ends, nothing to differentiate the one chamber from the other, is a structure within and covered by claims 1 and 3 of the patent in suit. This contention is supported by the difference in the language of the claims to which attention has been invited, and the following language of the specifications:

"Of course, a clear line of demarcation is not in all cases necessary, and any *means* of confining to a greater or less extent the deposits will fulfill the conditions; the necessary feature being an organization [of the globe] where the phenomenon of diffusion operates to carry the vapors produced at the arc away from the light-emitting wall before they are condensed and the oxides or other solids deposited."

If this contention be correct, then any globe so formed or configured that the wall thereof about and for a space near to the arc is kept so heated that the gases and vapors will not condense there, and so formed or configured as to provide a space above for condensation and a space below for the settlement and deposit of the heavier material or gases generated at the lower electrode, is within and covered by claims 1 and 3, and the defendant infringes.

It is, of course, a somewhat complex or unusual use of words to speak of "a single globe or inclosure," without any physical separa-

tion or division of any kind, as being divided into "a plurality of superposed chambers by suitable configuration of the walls," for the reason that gases and vapors given off by the arc inclosed by such globe will rise and condense and deposit to some extent in the upper part of such globe, and the heavier residuum fall to and rest in the lower portion of such globe, while the central part contains none of such deposit, provided the shape of the globe is such that the part of the wall surrounding the arc and near it is so closely located thereto that the gases will not condense or deposit there on account of the heat, and when in fact the globe is shaped like a perfect cone with the upper part somewhat expanded. It is like saying of a single room, without partition or physical division of any kind, that it has two chambers, an upper and a lower chamber, for the reason the foul air sinks to and occupies the lower part, while the pure air rises to and occupies the upper portion of such room.

### True Construction.

[1] However valuable, new, and novel the actual discovery and invention of a patentee, and however accurate the disclosure and description thereof in the specifications of his patent, he must claim it, or it is deemed abandoned to the public. No court can legally rewrite a claim, so as to cover what is described and constitutes the real invention, if not embraced in or covered by the claim as written and allowed. However, no just court will give a technical or narrow construction to the language of a claim, if by doing so the claim is defeated. That construction should be given which will uphold the claim, if it can be done without doing violence to the language used. But it is not sufficient to uphold a claim that the court can see that the patentee *intended* to cover his real invention by the language of the claim, when in fact he did not. Nothing has been more frequently declared in patent law than that a meritorious inventor may disclose a valuable invention, but fail to claim it by appropriate language.

### The Defense.

The defendant here says that while complainant may have a perfectly good patent and valid claims for what is in fact claimed, embraced within and covered by the language of the claims, still it does not infringe those claims, as it is not using the structure described, but something entirely different and disclosed by the prior art, and which, therefore, it has the right to use, at least so far as the complainant is concerned. The defendant insists that the complainant has claimed a specific device, which it does not use, and that, even if the complainant is entitled to the doctrine of equivalents, the defendant is not using a well-known equivalent for complainant's structure, at least that it was not a well-known equivalent at the time complainant applied for and obtained his patent in suit.

The complainant, by the Carbone patent, has done away with and discarded the circulatory system of the prior art; that is, it has discarded all conduits for creating a circulation within the globe, whereby the gases and vapors generated at the arc are forced upward into the

condensing chamber and in part downward to the deposit or lower chamber. It relies largely on the law of diffusion, or, as Carbone termed it, "the phenomenon of diffusion," which is the gradual and spontaneous molecular mixing of two fluids, or gases, which are placed in contact one with the other. It takes place without the application of external force, and even when opposed by the action of gravity, as when a heavier gas is placed below a lighter one there will result a mixture of the two by spontaneous molecular action. The molecules of the two fluids have motion and mutual attraction, and a tendency to commingle without exterior aid. Carbone knew, of course, that the heated gases, etc., would rise within the globe. Carbone also discarded the idea that it was necessary to force the gases and vapors away from the neighborhood of the arc, and relied on the discovery that they would not condense and attach themselves to the wall of the light-giving chamber so long as that space and wall was sufficiently heated. He therefore drew the walls of the light-emitting chamber as closely as possible to the arc, instead of curving it away from the arc, so that the middle chamber has "a transparent wall surrounding the arc closely for preventing the gases produced by the arc from condensing on said walls." I think it plain that one of Carbone's ideas was that the configuration of the walls must be such as to come as near as possible to the arc, and at the same time not interfere with the upward tendency of the gases and vapors and molecular attraction or diffusion. But he had another idea, which he expressed at every opportunity, both in the specifications and in the claims, viz., that he must divide his globe into a plurality of superposed chambers by suitable configuration (shaping) of the walls, or by contractions of the walls.

The defendant urges that, giving the broad construction to Carbone's claims 1 and 3 contended for, he was anticipated, so far as his globe is concerned, by several prior patents, notably the English patent to Fairweather, No. 28,409, granted February 23, 1905, for electric arc lamp, and which in the drawings, Figs. 1 and 2, shows an elongated egg-shaped globe, with smooth, unbroken walls and an upper condensing chamber or section, and is supplied with means for a circulatory system whereby the gases and vapors formed at the arc are carried or forced upward, outward, downward, and then inward, and then down to the bottom of the globe, etc. The walls of this globe opposite the arc are furthest therefrom, and this was an intentional construction, so as to have the sides or walls as cool as possible at this point, so as not to interfere with the downward circulation as the vapors passed downward from the condensing chamber. The Fairweather idea was that the heat emanating from the arc should be dissipated as rapidly as possible, and as low a temperature as possible maintained in the globe, so as to (it is declared) prevent the formation of the coat of soot, etc. The patent says:

"The invention further and particularly relates to that variety of arc-lamps wherein the arc is formed within a substantially air-tight inclosure; one object of my invention being to provide simple and efficient means for at once stoppering or closing the arc-inclosing globe, and insuring the rapid, continuous dissipation of the heat from the electric arc, with a view to main-

taining a low temperature within the inclosing globe and preventing the formation of the coat of soot which markedly cuts down the light efficiency of other lamps after a few hours' use. A further and distinct purpose of dissipating the arc heat is to prevent the cracking or melting of the globes, and thereby greatly reduce the cost of maintaining the lamp in service. * * * The arc-inclosing means comprises the usual deep, slender, glass globe, G, and the stoppering device or closure, D, which latter differs from all others in form and function. It is generally conceded and stated that fully one-half the cost of maintaining inclosed-arc lamps lies in the expense of cleaning the globes and replacing those which are cracked or melted or warped by the great heat of the electric arc. It is also well known that the effective candle power of an arc-lamp of the inclosed-arc type is greatly reduced by the deposition of carbon and other residual products upon the inner walls of the globe. In the ordinary arc-lamp, this coating, which obscures the light, becomes apparent within a few hours after the lamp is placed in service, and, by the time a set of carbons has been consumed, becomes so thick and heavy as to seriously cut down the efficiency of the lamp. The residue deposited on the glass is commonly called 'soot,' and is difficult to remove except by a chemical process. I conceive that the deposition of soot within inclosing globes is a direct consequence of the high temperature attained by the confined gases, and that it may be prevented by any means that will operate to markedly reduce that temperature. * * * The effect of this device is to reduce the temperature within the globe to the extent of several hundred degrees, and the baking on or deposition of soot upon the glass globe is positively prevented. The soot is for the most part deposited upon the under surface of the insulator, 3, and upon the walls of the radiator, and that which returns to the globe is so far cooled and condensed as to be precipitated, and accumulates as a fine, loose powder in the bottom of the globe. In addition to the cooling effects of the novel globe closure, it should be noted that the dividing device employed therein has the effect of causing the gases to circulate rapidly within the globe, resulting in the exposure of the coolest gases upon the inner walls of the glass globe. The downward moving currents of gas tend to scour or free the surface of the globe from particles that may be precipitated thereon, and furthermore, by being caused to descend to the bottom of the globe, undoubtedly part with a certain proportion of their heat by radiation through the coolest portions of the globe."

In short, the Fairweather patent proceeds upon a theory the very opposite of Carbone's, except in that he provides a "radiator" or condensing chamber. Fairweather had no conception that heat would prevent the condensation of these gases, and that it was desirable to maintain a high degree of heat in the light-emitting zone. On the other hand, he curved the wall of this part of the globe away from the arc, while Carbone brought such walls as closely as possible to the arc. In short, Fairweather's globe is further from being truly cone-shaped than are Figs. 1, 2, 3, and 4 of Carbone, although, if we give to claims 1 and 2 of Carbone the construction asked for by complainant, we would have Fairweather's globe an arc-lamp globe "divided into a plurality of superposed chambers by suitable configuration of the walls," as we would have an infinitesimal number of circular contractions going upward from the arc, and the same going downward therefrom, and we would also have "a change of angle or inclination of the wall" of the light-emitting part of the globe "with respect to the arc or general alignment of electrodes." I am satisfied that Fairweather's globe does not anticipate Carbone's globe, and equally well satisfied that the defendant does not use the Fairweather globe, or its substantial equivalent.

I have examined the Blondel patent of May 16, 1911, No. 992,479, application filed January 15, 1906; the Ross patent of June 6, 1911, No. 994,427, application filed February 9, 1903; the Jones patent, No. 935,518, of September 28, 1909, application filed September 16, 1907; the Steinmetz patent, No. 892,768, issued July 7, 1908; and the Carbone British patent, No. 17,448, of October 14, 1909, and also the Thompson British patent of March 11, 1903, No. 5,952.

Thompson clearly had the idea of the diffusion of the fumes, gases, etc., generated at the arc, for he says:

"A further improvement relates to means for preventing the diffusion of fumes from the poles of an electric arc lamp."

He also says these fumes, if not collected, will condense in the upper part of the lamp and eventually interfere with the proper operation of the regulating mechanism. He provides a cooling or condensing chamber. I do not see that he dealt at all with the problem of keeping the light-emitting part of the globe clean and free of deposits. He was well acquainted with the fact that a cooler temperature facilitated or produced condensation of the fumes.

Steinmetz used an outer and an inner globe (as does defendant), and while he was dealing with the problem of preventing the deposit of the condensed gases on the light-emitting part of the globe he provided an elaborate circulatory system, viz., an opening at the bottom of the inner globe inclosing the arc, openings into a chamber above, and openings thence into the outer globe. He also provided wire screens in his upper or condensing chamber for catching and retaining the condensed gases, etc. The heat of the arc started the circulation, and the opening at the bottom of the inner globe permitted the ingress of air. The gases passed up into the screening chamber, and what was not deposited and retained passed on with the current down into the outer globe, and thence into the inner globe, and up past the arc into the screening chamber, and so a constant circulation was kept up. His theory was that by means of this system no condensation would take place in either globe, and hence no deposit there. Both globes curved furthest away at the arc. Neither complainant nor defendant uses any such system.

Jones has an inner or arc-inclosing globe and a complete circulatory system, and provides passages from a chamber above the arc to a chamber below the arc, and says:

"The heat of arc in chamber A causes a strong upward draft of the heated gases therein, the gases being then carried over into the chamber B, and from thence being returned to chamber A by way of the way of the passages d and c, and the chamber C. As the temperature of the passages d and e is much lower than that of the chamber A (the arc chamber), a large portion of the fumes will be condensed in these passages, while, the uncondensed portions being returned to the chamber A, their temperature is again raised by the heat of the arc, so that deposit on the transparent envelop of the chamber A is practically prevented below or in the region of the arc."

Jones also says:

"I have found that, for successful working of inclosed-arc lamps using carbons carrying chemicals, it is necessary that the chemicals added should give off vapors having a high vapor density and thus forming a compara-

tively small arc, and therefore a small region within which the electrical energy is dissipated; the effect of this being to raise the vapors in the arc to a high degree of incandescence, giving a high light efficiency. I have also found that it is desirable to add salts having a high melting point, and for this reason it is desirable to add a steadying salt, which acts as a flux in melting the chemicals to form a uniform liquid before vaporization. I find that with such mixtures no liquid slags are formed, and therefore the troubles caused in other lamps in which chemicals are used are completely avoided. My invention consists in an inclosed-arc lamp, in which the electrodes are disposed in a substantially air-tight chamber of small capacity, formed of a transparent or translucent arc-inclosing part, and one or more short passages connecting the ends of said part, whereby the gases are circulated in such a manner as to substantially prevent the formation of eddies and deposit on the arc-inclosing walls; the hot ascending gases sweeping the walls in a rapid current."

Jones fully understood that sufficient heat would prevent the condensation and deposit of these gases or fumes; but he did not understand that a single globe, without appliances for producing a circulation, is all-sufficient, provided there is sufficient space for deposits at a distance above the arc and a similar space below, and he did not seem to appreciate that by bringing the wall of that part of the globe which is to give out the light as closely as possible to the arc, and so shaping his globe as to leave the upward rise of the fumes or gases unobstructed, he would solve the problem of keeping the light-emitting part of the globe clean and clear of condensed gases. His arc-inclosing globe is substantially a sphere. As I have stated, Carbone, on the other hand, brought the light-emitting part of his globe as closely as possible to the arc, and left space above and below for the condensation and deposits, trusting to heat at the so-called lighting chamber to prevent a clouding of the globe, and to the lower temperature above and below for the condensation and deposit of the gases or fumes at those points.

The Ross patent, while pointing out the evils of these deposits, made no attempt to remedy them, except by providing a cover with a frame and a bowl-shaped globe with walls removed as far as possible from the arc. After pointing out the evils of these deposits he says:

"The small size of the common arc-inclosing globe, and the consequent close proximity of the arc to the glass, aggravate these difficulties. A special object of my invention is to simplify the lamp, by using but one inclosing glass, substantially hemispherical in shape and of such size that proper diffusion of the rays of the arc will be obtained, *while all parts of the glass are so far removed from the arc that the objections common to other types will be eliminated.*"

Instead of bringing the lighting chamber *close* to the arc, he removes it therefrom as far as possible.

I am of the opinion that the correct disposition of this case depends on the construction of the claims in issue of the Carbone patent and the limitations therein contained. If claims 1 and 3 demand a two-chambered globe in the literal sense of having some physical dividing line or partition line between them, one chamber for the lighting zone, and the other or lower one for deposits (not including or referring to the upper or condensing chamber), it is

very clear that defendant uses no such structure. Can we, in view of the specifications, eliminate and disregard the words "and divided into a plurality of superposed chambers by suitable configuration of the walls, the middle chamber having," etc.? Can we say that "divided" means the division made by the deposit and nondeposit of condensed gases, and that the words "suitable configuration of the walls" mean walls disposed at such an angle and without change of angle with reference to the alignment of the electrodes that the diffusion of the gases is not interfered with? May we not properly inquire why Carbone did not describe or show in his drawings a globe having no contraction in the walls or drawing-in thereof at the point of division between the chambers? I can but suspect that Carbone had in mind that he would devise some means, some structure or form of globe, which had no clear line of demarcation between the chambers, for he says:

"Of course, a *clear* line of demarcation is not *in all cases* necessary, and any means of *confining*, to a greater or less extent, the deposits, will fulfill the conditions," etc.

But he immediately adds:

"The *present invention consists* in providing a separate chamber for the arc by forming a series of *circular contractions* in the globe, so that it is divided into several superposed chambers."

In Figs. 1, 2, 3, and 4, he shows actual, visible contractions in the walls of the globe. Did he refer to what he thus showed, or did he refer to a cone-shaped globe without such actual contractions, but built up, as complainant's brief says, by—

"a plurality of circles adjacent each other, each of which would be contracted in respect to the largest diameter of the upper chamber. Similarly, if this member be molded to the conical shape resulting from Fig. 3, it would be contracted in respect to the upper chamber, but in addition thereto it would be sectionally contracted in respect to itself, since it is composed of a plurality of sectional contractions, one adjacent to the other and each smaller than the other; the largest cross-section being at the base, or at the largest diameter of the cone, and the smallest one at the apex or blunted end of the cone."

Giving claims 1 and 3 this meaning, we have thousands or millions of superposed chambers, depending on the size of the succeeding sectional contractions, and we would have a heating or arc chamber made up of thousands of smaller chambers, with no boundary line until the arc-light was put in operation, and then such boundary line of the middle or arc chamber would be determined, not by any configuration of the walls, but by the point where deposits on the wall of the globe ended. This refinement may have been in the mind of the patentee, but it seems to me that it is not expressed or suggested in the language of claims 1 and 3, or that of either of them, as aided by the specifications. However much a court would like to eliminate a limitation found in the claim of a patent, or however much it would like to write into it something not found there, it cannot justly or legally do so, although it may be done by a few strokes of the pen and an arbitrary decision.

The complainant says:

"The patent itself uses the word 'chamber' quite frequently, but says, 'I have found that excellent results are obtained when a depositing space is provided both above and below,' but immediately, 'it was soon found that, when one or both chambers were omitted,' etc. Thus the word 'chamber' is rightly used in the sense of surrounding a 'space.' It is with the understanding of the word 'chamber' in this light that the patent calls the co-operating parts 'chambers.'"

The complainant's brief also says:

"It needs no evidence to show that a cone is a sectional contraction of a cylinder, and that the conically shaped glass portion of defendant's lamp consists of a plurality of contractions in the globe or in respect to the cylinder tangential to the periphery of the upper depositing chamber. But, however many contractions there may be, none concern us, excepting that one, or those, if more than one, which perform the function of the contractions in the patent. It is that contraction consonant with the imaginary line of intersection distant from the arc equal to the critical distance, and it is that contraction which differs from the contraction immediately adjacent by operating in a different manner. It is that contraction which separates a light-emitting space-chamber from the depositing space-chamber. It is that contraction which divides the globe into superposed space-chambers communicating with each other. Finally, it is that contraction of the patent specification referred to in: 'The present invention consists in providing a separate chamber for the arc by forming a series of circular contractions in the globe, so that it is divided into several superposed chambers.'"

I am not at all content with this reasoning. If we leave out the contractions in the walls of the globe, we have surrounded the entire space inclosed within the globe, and have but one chamber. If each and every part of the interior of the globe surrounded by the straight lined wall only is a chamber, we have thousands of chambers, and the middle chamber will be ascertained by measurement on the perpendicular line, and not by the location of the arc or the limits of the deposit.

I am reluctantly brought to the conclusion that, while the defendant's structure is within the spirit of Carbone's invention and within the terms of that which he described in the specifications, it is not within or covered by the claims in suit, which have self-imposed limitations that cannot be changed or disregarded. The complainant is entitled to the doctrine of equivalents, but there is no evidence in this case that defendant's structure was the known equivalent of complainant's at the time the patent was applied for or granted. As a mechanical structure, the one is not the equivalent of the other. I think that defendant's structure operates on the same principle as does the complainant's, and that generally speaking the one produces the same results as does the other. I also think that contractions in the walls of the globe are unnecessary and useless, and that the division of an arc-lamp globe into more than two chambers is unnecessary. There must be a condensing chamber to take care of the deposits, and an arc chamber for emitting the light, and the walls of this chamber must be kept clean, or free from deposits. Even if some of the heavier condensed particles fall to the bottom of the lighting chamber, no serious consequence results, and in any event a contraction in the wall of the globe is unnecessary.

[2] It is a question, therefore, whether the introduction of a limitation into the claim of a patent which has no effect on the operation and utility of the device makes an infringer of one who discards the limiting element, but uses the construction of the patent with such element eliminated. In other words, if a patentee introduces an unnecessary element into his claim for his invention, and another discovers that such element is unnecessary, or superfluous, and therefore does not use it, but makes a structure otherwise identical with that of the patent, is he an infringer? This point has been passed upon many times. In Dunbar v. Meyers, 94 U. S. 187, at page 202, 24 L. Ed. 34, the court said:

"It is settled law that, when the respondent in constructing his machine omits one of the ingredients of the complainant's combination, he does not infringe the complainant's patent"—citing Gould v. Rees, 15 Wall. 194, 21 L. Ed. 39; Prouty v. Ruggles, 16 Pet. 341, 10 L. Ed. 985; Vance v. Campbell, 1 Black, 427, 17 L. Ed. 168; Gill v. Wells, 22 Wall. 28, 22 L. Ed. 699.

And in Wright v. Yuengling, 155 U. S. 47, 52, 15 Sup. Ct. 1, 3 (39 L. Ed. 64), the court said:

"Now, while this semicircular connecting piece may be an immaterial feature of the Wright invention, and the purpose for which it is employed accomplished, though less perfectly, by the extension of the guiding cylinder in the manner indicated in defendant's device, yet the patentee, having described it in the specification and declared it to be an essential feature of his invention, and having made it an element of these two claims, is not now at liberty to say that it is immaterial, or that a device which dispenses with it is an infringement, though it accomplish the same purpose in perhaps an equally effective manner. Vance v. Campbell, 1 Black, 427 [17 L. Ed. 168]; Water Meter Co. v. Desper, 101 U. S. 332 [25 L. Ed. 1024]; Gage v. Herring, 107 U. S. 640, 648 [2 Sup. Ct. 819, 27 L. Ed. 601]; Gould v. Rees, 15 Wall. 187 [21 L. Ed. 39]; Brown v. Davis, 116 U. S. 237, 249 [6 Sup. Ct. 379, 29 L. Ed. 659]."

But this rule is not carried to the ridiculous extent of allowing an infringer to escape by merely changing the form or shape or size of an element specified in the claim of a patent, especially when shape, size, or form is not of the essence of the invention claimed. Winans v. Denmead, 15 How. 330, 14 L. Ed. 717. But change of form is one thing, and an omission of an element is quite another. Suppose we rewrite claim 1 of the patent in suit so as to read, "An arc-lamp globe specially adapted to the use of impregnated carbons, having a plurality of superposed spaces surrounded by the walls of such globe but in no way divided from each other, the middle space having a transparent wall surrounding the arc closely for preventing the gases produced by the arc from condensing on such transparent walls," would we have the same claim found in the Carbone patent? Clearly not, for we have eliminated the *division* of the spaces and the *configuration* or shaping of the walls of the globe to effect such division.

[3] Turning to the file wrapper of the Carbone patent in suit, we find strong evidence that in framing claims 1 and 3 he had in mind, and intended and deemed essential, a physical division of his globe, the glass part, into two chambers or spaces, by means of contractions, or other shaping or configuration, of the walls, so that the

one should be distinguished and distinguishable from the other, not only when in operation, but when not in operation. It is quite true that the language of a claim as allowed and the plain import of same is not to be cut down, limited, or changed by what the patentee may have said while the application was pending and under consideration in the Patent Office; but, when it is sought to give to the language of the claim some unusual or extraordinary significance or meaning, we may properly look to the declarations and statements made by the applicant to the Patent Office examiners in support of the claims and to induce their allowance. Turning, then, to the "Remarks" accompanying and forming a part of Carbone's communication to the Commissioner of Patents, dated August 31, 1909, we find the following:

"In the further prosecution of this test the inventor found out that the limit between the part having a deposit and the part which is free of the same can be clearly defined, when between $B$ and $C$ a sufficient strong contraction is formed. Then the construction shown in Figure 3 is obtained. * * * But, whatever will be the theory of the process, the fact, according to the observation of the inventor, cannot be denied that it is sufficient when the *space* surrounding the arc is divided into three chambers, which are *separated from each other by means of contraction*, so that the precipitate is formed exclusively in the upper and lower chambers, and that the middle chamber remains clear."

As claim 1 stood December 21, 1909, instead of "a plurality of" it contained the words "three or more," and instead of "configuration of" the words "contractions in," and the words "more or less" preceded the word "closely." On that day the examiner said:

"Claim 1 is rejected as being for subject-matter not disclosed. There are not more than three chambers shown. The claim is rejected as being rendered indefinite by the expression 'more or less.'"

Thereupon, and March 11, 1910, Carbone amended claim 1 by canceling the words "three or more" and substituting "a plurality," but protested and said:

"The applicant does not admit that he had not the right to claim the feature 'three or more,' since Figure 2 shows the chambers $A$ and $C$, and the part $B$, comprises also two chambers, making four in all."

May 9th, in response, the examiner said claim 1 was allowed, but June 23, 1910, said:

"Upon reconsideration it appears that lines 21 to 30, page 2, require revision, as will be apparent upon inspection. It also appears that claims 1 and 3 are inconsistent. A plurality is more than one, but obviously the globe could not be divided into two chambers by more than one concentration. Furthermore, Fairweather shows a globe with two (a plurality of) superposed chambers, and these claims must therefore be rejected."

Thereupon Carbone again amended claim 1 and also claim 3 to meet this new objection, by changing the words "contractions in," claim 1, to "configuration of" and, in claim 3, "contractions formed in" to "configuration of." It seems to me perfectly clear that Carbone and his attorneys and the Patent Office always had in mind "chambers" or divisions of the space within the globe, formed by some physical contraction of the globe wall, or some other phys-

ical change in the wall lines, and that a partial actual physical division of the entire space to form distinct chambers is demanded by claims 1 and 3. I am not unmindful of what is said in Wright v. Yuengling, supra, 155 U. S. page 52, 15 Sup. Ct. 3, 39 L. Ed. 64, "If the guiding cylinder of this patent had been a pioneer invention, it is possible the patentee might have been entitled to a construction of this claim broad enough to include the defendant's device, notwithstanding the absence of the semi-circular connecting space," although the court had just used the language already quoted, and "a literal construction is not to be adopted where it would be repugnant to the manifest sense and reason of the instrument" (Brown v. Guild, 90 U. S. 181, 23 L. Ed. 161), and "the reasonable presumption is that, having a just right to cover and protect his whole invention, he intended to do so" (Winans v. Denmead, supra); but "the claim of a patent is a statutory requirement prescribed for the very purpose of making the patentee define precisely what his invention is, and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms" (Howe v. National, etc., 134 U. S. 388, 10 Sup. Ct. 570, 33 L. Ed. 963). I am unable to see that these claims are susceptible of two constructions, one of which constructions will embrace the defendant's structure; but, on the other hand, they show clearly what the patentee desired to secure as a monopoly, and hence nothing can be held to be an infringement which does not fall within the terms the patentee himself has chosen to express his invention. McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800.

It is quite true that the language of a patent is addressed to those skilled in the art especially, and the claims and specifications may be expressed in the language of the art to which the patent relates, however technical. If even common words have a special, extended, or restricted meaning when used in that art, courts are bound to give them that meaning. But I fail to find in this record anything which indicates that in this art of electrical lighting, or arc-lamp or arc-lamp globe making, the word "divided" has any special meaning other than separated, or that "plurality" means less than two, or that "superposed" does not mean one above another, or that "chamber" signifies other than a space wholly or partially inclosed or having boundaries indicated by some physical sign, especially when it is stated that the division is to be made by a suitable configuration of the walls of a glass globe.

I have endeavored to bring this case within the decision of the Supreme Court in Ives et al. v. Hamilton, 92 U. S. 426, 430, 23 L. Ed. 494, but am unable to do so. The patentee, Carbone, whatever his actual inventive idea or conception, and however broad and meritorious, was bound to provide and describe *means* for making it effective and useful. Ideas and conceptions and functions are not patentable. Carbone, in claims 1 and 3, described and claimed means; but this did not exclude others from devising and obtaining a patent for means to accomplish the same result, keeping the light-emitting part of an arc-lamp globe clean and clear of deposits,

provided they devised different means, however much simplified, means not within the range of equivalents for those described and claimed by Carbone. If Carbone has described, but failed to claim, the means used by this defendant, probably he may apply to the Patent Office and claim them yet. But that is not the question here, which is: Has Carbone claimed a globe with three chambers, an upper or condensing chamber, an arc or lighting chamber, where the heat is more or less confined and the wall is brought as closely as practicable to the arc, and a lower and we may say depository chamber, and distinguished and distinguishable from each other by either a contraction in the walls of the globe, or by some change of angle in the walls of the globe; that is, some actual configuration of the globe walls which will distinguish the one chamber from the other? This is the "means" specified and claimed in the claims in issue here, and the cone-shaped globe (leaving out of consideration the upper or condensing chamber common to both and well known in the prior art) used by defendant, and which has no contraction of its walls and no change of configuration of its walls at all to divide the one chamber from another, was not a well-known equivalent therefor when Carbone applied for or obtained his patent; hence there is no identity or equivalency of means, although the operation of the two globes is similar, and the result obtained substantially the same. See Westinghouse v. Boyden, etc., 170 U. S. 569, 18 Sup. Ct. 707, 42 L. Ed. 1136, and Henry Huber Co. v. J. L. Mott, etc. (C. C.) 113 Fed. 599, 604. As the words of these claims have to do with the essentials of the means described and claimed, and are not merely descriptive of their form or shape, I am compelled to hold that, while the Carbone patent is valid and not anticipated, the defendant does not infringe the claims in issue.

The bill must be dismissed, with costs.